**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| LEONA BAHAMON, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:20-CV-00056-SDJ- |
| v. | § | CAN |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff brings this appeal pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for benefits. After reviewing the Briefs submitted by the Parties, as well as the evidence contained in the administrative record, the Court recommends that the Commissioner's decision be **AFFIRMED.**

**BACKGROUND**

**I.     PROCEDURAL HISTORY OF THE CASE**

On July 17, 2017, Plaintiff Leona Bahamon ("Plaintiff") filed an application for "disability insurance benefits and supplemental security income benefits alleging a disability onset date of July 21, 2017 under Title II of the Social Security Act" [Dkt. 1].  On October 17, 2017, the claim was initially denied [TR 89-93], and upon reconsideration on January 18, 2018 [TR 96-99], Plaintiff's application was again denied.  Plaintiff requested an administrative hearing ("Hearing") [TR 100-13], which was held before an Administrative Law Judge ("ALJ") on December 18, 2018 [TR 117].  At Hearing, Plaintiff and a vocational expert ("VE") presented testimony; Plaintiff was represented by counsel [TR 31-68].

On February 26, 2019, the ALJ issued an unfavorable decision denying Plaintiff's application [TR 8-30].  On March 11, 2019, Plaintiff requested review of the ALJ's decision by the Appeals Council [TR 151-55].  The Appeals Council denied Plaintiff's request on November 19, 2019, making the decision of the ALJ the final decision of the Commissioner [TR 1-4].  On January 23, 2020, Plaintiff filed the instant suit [Dkt. 1].  Plaintiff filed her Opening Brief on July 27, 2020 [Dkt. 14], the Commissioner filed its Brief in Support on October 26, 2020 [Dkt. 18], and on November 4, 2020, Plaintiff filed her Reply Brief [Dkt. 19].

## II.   STATEMENT OF RELEVANT FACTS

### 1.   *Age, Education, and Work Experience*

Plaintiff was born on June 22, 1971, making her forty-six (46) years of age at the time of alleged onset [TR 24, 156].  Plaintiff's age classification at alleged onset was that of a "younger person."  *See* 20 C.F.R. § 404.1563(c).  Plaintiff has a high school education, two associate degrees, and past relevant work experience as a physical therapist assistant and an administrative assistant [TR 22, 60-61].  Plaintiff has not engaged in substantial gainful activity since July 21, 2017 [TR 12-13].

### 2.   *Plaintiff's Relevant Medical Records*

The ALJ found Plaintiff has the following severe impairments: cervical spine disorder, rotator cuff tendinosis, idiopathic orofacial dystonia, functional movement disorder, conversion disorder with motor symptom or deficit, and a pain disorder with psychological factors [TR 14].  Only the ALJ's finding that Plaintiff's mental impairments are nonsevere is at issue in this cause.  Relevant to these conditions and the arguments raised by Plaintiff are the medical opinions and evaluations from Dr. Bharathy Sundaram, M.D. ("Dr. Sundaram"), cognitive psychologist Apryl Harris, Psy.D. ("CP Harris"), Dr. Sabrina Austin, Ph.D. ("Dr. Austin"), and State Agency Medical

Consultants Dr. Andrea Allen, M.D., and Dr. Randal Reid, M.D. (together, "SAMCs"), summarized as follows.

### a. *Treating Physician – Dr. Sundaram*

Plaintiff was referred to neurologist Dr. Sundaram by Dr. Ishaq Ali, M.D., for Botox injections to treat her cervical dystonia and left orofacial dystonia [TR 473]. On April 25, 2018, Plaintiff presented to Dr. Sundaram for the injections, and his physical evaluation reported moderate depression and anxiety, with no psychotic symptoms, suicidal ideations, mania, or attention deficit disorder [TR 473-74]. On May 30, 2018, Dr. Sundaram noted the same psychological/psychiatric symptoms as her first visit [TR 470-72], referring Plaintiff for neuropsychological testing to determine her current level of functioning and to aid in diagnosis and treatment planning [TR 471-72, 490], which was performed by CP Harris. After the neuropsychological evaluation, on July 31, 2018, Dr. Sundaram reviewed the results and found generally intact overall neurocognitive functions, and no cognitive decline significant enough for a diagnosis of a progressive neurodegenerative disease [TR 466-68]. He noted that while Plaintiff's overall cognitive functions are not significantly impaired, she does experience anxiety, likely due to her high functioning before her injuries [TR 466]. Plaintiff's complex interactions between physical and mental illness likely exacerbates her anxiety and depression [TR 466]. Continued psychotherapy was recommended to help Plaintiff cope with her functional losses and limitations due to the loss of some ability to perform her former job as a physical therapy assistant [TR 466]. On October 10, 2018, Dr. Sundaram evaluated Plaintiff for two severe episodes of pain related to her dystonia, and relevant here, his notes addressing functional movement disorder discuss no limitation on her mental functioning [TR 462-65]. Indeed, he noted Plaintiff was "doing

much better with the current symptoms and ~50% better," and further, that Plaintiff was tolerating her increased dosage of psychiatric medication and was seeing a clinical psychologist [TR 465].

On December 21, 2018, Dr. Sundaram completed an eight-question, check-form Functional Movement Disorder Questionnaire [TR 749-50]. He indicated: (1) Plaintiff could understand, remember, and carry out only simple instructions; (2) that Plaintiff has a "substantial loss in the ability to effectively function" in order to maintain attention or focus for extended periods, to complete a normal workday and work week without interruption from psychologically-based symptoms and to perform at a consistent pace without unreasonable rest breaks, and to get along with co-workers, supervisors, and the general public[1] [TR 749]. Plaintiff had "no useful ability to function" in the areas of responding appropriately to usual work stresses and to changes in a routine work setting [TR 750]. Dr. Sundaram left blank the response to the question asking whether there are any conflicts between these limitations and his clinical findings [TR 750]. To conclude, Dr. Sundaram reported it would be "reasonable to medically infer" that the limitations addressed by his survey responses "existed to the degree indicated above since November[] 2016, the date Ms. Bahamon stopped working due to her medical condition(s)" [TR 750].

### b. Treating Physician – CP Harris

On July 3, 2018, CP Harris performed a neuropsychological evaluation on Plaintiff upon referral by Dr. Sundaram [TR 490-504]. Plaintiff reported she recently experienced moderate depression and anxiety, and intermittent depression since age forty-five and attributed it to the loss of her profession [TR 491]. CP Harris found:

---

[1] As defined by the questionnaire, an individual suffers "a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment, but, at best, could do so only in a sheltered work setting where special considerations and attention are provided" [TR 749].

Her activity level, distractibility, attention, and sustained attention were all within normal limits. There were no observed problems with impulsivity. Her speech was articulate and fluent, with normal prosody and adequate content. Her expressive and receptive language skills were adequate for conversation. She maintained good eye contact. Her mood was primarily neutral, but dysthymic at times, and her affect was congruent with her mood. She demonstrated adequate modulation and an appropriate range of available emotions. Her thought process was organized and rational, with no signs of unusual preoccupations, delusional beliefs, perceptual distortions, or dangerous impulses.

[TR 494]. During testing, Plaintiff was cooperative and pleasant, easily engaged in conversation, demonstrated an appropriate sense of humor, motivated, demonstrated an organized and persistent approach to tasks, and was vigilant to mistakes [TR 494]. In light of Plaintiff's commitment to the assessment, "[s]tandardized test administration was maintained, and the results are believed to accurately reflect her current cognitive and emotional functioning" [TR 494]. As to validity, CP Harris indicated:

> [Plaintiff] endorses only a limited number of symptoms that are unusual or atypical for individuals who have genuine psychiatric or cognitive disorders. Individual scales reflect the degree to which Ms. Bahamon endorses unusual symptoms that are not typically present in patients with actual problems. Specific scales above the recommended cutoff score include the neuroses scale. This suggests that her report of symptoms is either highly atypical or inconsistent with the presentation of a patient who has genuine impairment in this area.

[TR494]. The following testing results and interpretations were reported, as summarized in relevant part:

- Mental status: "high average" with "intact attention, short-term memory, simple construction, articulation, immediate memory, confrontational naming, simple reading, repetition, comprehension, and writing" [TR 495];
- Intellectual Functioning: "falls in the average range" [TR 495];
- Academic Achievement: "high average performance in word reading" [TR 495];
- Language Screening: average range on each task [TR 495];
- Attentional Functioning: "average overall working memory" with "low average simple auditory attention [ ] and average complex or divided attention," as well as low average processing speed [TR 495];
- Memory Screening: "low average" delayed visual design recall, while overall verbal memory was in the "superior range," as was "overall immediate recall" [TR 495];

- Executive Function: "borderline when compared to same-age norms" for performance on a task that assesses sequencing, visual scanning, and sustained attention; on a test of conceptual problem solving, had "intact performance when compared to same age individuals, with average accuracy" [TR 496-97];
- Emotional Functioning: objective measures of psychological disorders found one significant elevation for depression; few or no thoughts of death or suicide; effective in social relationships and no trouble with attention or concentration; average symptom level for mania; "an above average level of overall anxiety . . . indicating a person who may be experiencing some stress, and is worried, sensitive, and emotional"; above average overall somatization, indicating preoccupation and concerns about her physical functioning; average, "reasonable" control over angry feelings and impulses [TR 497-99];
- Personality Functioning: high level of depressive affect; average difficulties due to dysfunction in her personality organization, indicating she is emotionally stable with healthy relationships; average antisocial traits exhibiting reasonable control over her impulses and behavior; "likely to be able to adapt to different interpersonal situations, by being able to both take and relinquish control in those relationships as needed"; likely has the ability to adapt to different interpersonal situations [TR 499]; and
- Treatment Issues: "average level of current or recent life stressors"; "some level of distress motivating a desire for change" that indicates acknowledging difficulties in functional and perceiving acute need for help dealing with these problems; and numerous personal assets may assist in her treatment process [TR 500].

Notably, the evaluation found that "absent other serious psychological issues, [Plaintiff] appears to be able to function despite her mildly depressed mood" [TR 497]. Summarizing these findings, in relevant part:

> The current test results show an individual with intact mental status. The present results find that her current level of overall intellectual functioning is in the average range. She demonstrated average verbal skills and visual perceptual processing abilities.

[TR 500]. Plaintiff's functioning and abilities were scored by degree of severity of impairment, from severely impaired to superior functioning. Standardized, norm-referenced cognitive testing showed Plaintiff had mostly average to superior functioning for most areas of consideration, with only one severe impairment:

> • Severe impairment: Fine motor dexterity (left).
> • Mild to Moderate impairment: None.
> • Borderline functioning: Fine motor dexterity (right) and immediate visual design recall.

• Low average functioning: Semantic verbal fluency, visuomotor problem solving, graphesthesia (left), simple auditory attention, processing speed, delayed visual design recall, visual cognitive flexibility, and resistance to cognitive interference (fluency).
• Average functioning: Overall intelligence, verbal intelligence, visual Intelligence, confrontation naming, phonemic verbal fluency, visual perception, complex visual construction, abstract visual analysis, graphesthesia (right), grip strength (left), working memory, complex/divided attention, visual design recognition, immediate complex visual recognition, delayed complex visual recognition, verbal reasoning, verbal cognitive disability, verbal switching accuracy, cognitive inhibition (fluency), resistance to cognitive interference (accuracy), and conceptual problem solving.
• Above average functioning: Mental status, word reading, grip strength (right), verbal recognition, and cognitive inhibition (accuracy).
• Superior functioning: Overall verbal memory, immediate verbal recall, delayed verbal recall, short-delay verbal recall, and long-delay verbal recall.

[TR 501]. CP Harris assessed the neurological implications of these assessments, reporting "generally intact overall neurocognitive functions with a severe deficit observed in fine motor dexterity (left) and mild decrements in fine motor dexterity (right) and immediate visual design recall," but Plaintiff's "cognitive decline is not significant enough to warrant a diagnosis of a progressive neurodegenerative disease" [TR 501-02]. Concluding the evaluation, CP Harris recommended Plaintiff would benefit from psychopharmacological interventions and psychotherapy to help her cope with her symptoms of depression and anxiety, including her functional losses and limitations [TR 502-04].

### c. Treating Physician – Dr. Austin

Dr. Austin, a clinical psychologist, composed a case summary for Plaintiff on December 12, 2018 [TR 506-07]. Plaintiff began treatment with Dr. Austin in February 2018 [TR 506]. Dr. Austin found Plaintiff's symptoms "were suggestive of a depressive episode with significant anticipatory anxiety" [TR 506]. Significant stressors included family issues, health concerns including chronic pain, lack of social support and outlets, and distress over being out of work [TR 506]. Dr. Austin included in her notes:

> From the beginning of our work together, I hypothesized that [Plaintiff's] symptoms were suggestive of a functional disorder, such as a conversion or pain disorder. At no point did I find her descriptions to be hyperbolic, nor did I find her behavior to be suggestive of feigning or malingering. However, based on my experiences in medical settings and my familiarity with movement disorders, I found her symptom presentation to be unusual and questioned to validity of the medical diagnoses she had carried from a previous neurologist.

[TR 507]. Dr. Austin updated Plaintiff's diagnoses to major depressive disorder, single episode, with "good" prognosis; pain disorder with related psychological factors with "fair to poor" prognosis; and conversion disorder with motor symptom or deficit with "fair to poor" prognosis [TR 507]. Despite poor prognosis for conversion disorder, Dr. Austin concluded that Plaintiff's "commitment to treatment, to remaining active, to working on her issues, and to improving her coping strategies are in her favor and are commendable" [TR 507].

Beyond this case summary, no other objective medical findings or treatment notes from Dr. Austin can be found in the record. On December 11, 2018, Dr. Austin denied access to the Plaintiff's therapy records and notes pursuant to Texas state law on the grounds that releasing them would be harmful to Plaintiff's physical, mental, and emotional health [TR 271]. She urged "[p]sychologists are not medical doctors," further declaring she would "not sign any documents that label [her] responses as a 'Medical Source' statement" [TR 271]. Dr. Austin responded to the provided questionnaire in an untitled response December 17, 2018 [TR 743-47]. Dr. Austin states from the outset that she "find[s] the majority of the submitted questions to be unanswerable" [TR 743]. Dr. Austin recommended that Plaintiff "not attempt to work fulltime" based on her observations that her attempts "to endure and persevere in spite of her distress were correlated with notable increases in her symptom severity, frequency, and duration" [TR 744]. In response to each question regarding mental limitations, Dr. Austin declined to assert an opinion, as cognitive

capacity is the domain of neuropsychologists, and because the questions were too vague [TR 743-44].

### d.  *State Agency Medical Consultants*

At the initial level, in October 2017, Plaintiff alleged disability due to the following conditions "multi-focal dystonia, left arm and shoulder weakness, and migraine headaches" [TR 69].  Dr. Allen completed Plaintiff's disability determination and found severe impairment for spine disorders [TR 69-76].  Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her stated symptoms were not substantiated by objective medical evidence alone and were only partially consistent with the total medical and non-medical evidence in the file [TR 73].  As to her residual functional capacity, Dr. Allen found Plaintiff has exertional limitations for: lifting/carrying occasionally twenty pounds, and frequently for ten pounds; standing and walking with normal breaks for about six hours in an eight-hour workday; sitting for about six hours in an eight-hour workday with normal breaks; and unlimited pushing/pulling [TR 73-74].  No postural, manipulative, visual, communicative, or environmental limitations were found [TR 74].  Dr. Allen determined Plaintiff was not disabled [TR 76].  Upon reconsideration, in January 2018, Dr. Reid evaluated the medical record reporting no changes to Plaintiff's physical or mental condition [TR 78-87].  Dr. Reid reached the same conclusion regarding Plaintiff's exertional limitations, except he found exertional limitations for pushing/pulling for the left upper extremities [TR 83].  Dr. Reid additionally found postural limitations for occasional climbing ladders/ropes/scaffolds and crawling, and manipulative limitations for occasional reaching left overhead [TR 84].  He found no visual, communicative, and environmental limitations [TR 84].  Plaintiff was found not disabled on reconsideration [TR 86].

   **3.**  ***Hearing Testimony***

     **a.** ***Plaintiff's Testimony***

On December 18, 2018, the ALJ held a Hearing [TR 32-68].  At Hearing, the ALJ

questioned Plaintiff, as did Plaintiff's attorney representative.  Plaintiff answered questions from

the ALJ regarding her past work, symptoms, and limitations at work and in engaging in daily life

activities.  Relevant here, Plaintiff described her past work as a physical therapist assistant, which

was limited due to the weakness in her left arm, but she could still instruct, exercise, and guide

patients through their rehabilitation [TR 40-41].  She described her jobs as an office administrator,

as sedentary, and she experienced increased her neck pain while sitting at a computer or

manipulating a keyboard for long periods of time, as well as difficulty typing due to the lack of

dexterity in her left hand [TR 41].  Plaintiff would become overwhelmed when small groups of

people would come into the office due to its small space [TR 41].  When asked what she views as

the primary problem preventing her from working full time, Plaintiff responded, "The muscle

spasms that I have in my shoulder and in my face and my neck' [TR 42].  She described the effects

of her muscle spasms on her work as follows:

> I cannot hold things in my left hand greater than two to three pounds before my arm
> begins to shake and give way.  The muscle spasms in my face and my neck causes
> my head to contort and causes significant increase in pain and headaches.  It does
> cause my left eyelid to droop, so it does sometimes make my vision a little wonky.

[TR 42].  Plaintiff said the shaking in her left arm and left hand, in addition to dexterity problems,

causes difficulty while typing [TR 42-44].

   Regarding her symptoms related to anxiety and depression, Plaintiff experiences "good

days and bad days", with more bad days than good [TR 48].  Her physical impairments that impede

her ability to work exacerbates her anxiety [TR 49].  Regarding treatment, Plaintiff explained

"therapy is going well, but it's been very difficult because [she] has to learn a new way of thinking

about [herself]" [TR 49]. Her desire to return to work and her work ethic developed serving in the military motivates her to seek relief through treatment and medication, but lack of results exacerbates her mental and physical symptoms [TR 57]. As for daily activities, Plaintiff attends family gatherings, takes her granddaughter to the movie theater, goes out to eat, drives, and grocery shops for small items [TR 50-52]. Both the physical and mental issues affect her ability to complete tasks some days [TR 49].

### b. *Attorney Representative at Hearing*

At the beginning of Hearing, Plaintiff's attorney representative made an opening statement urging the ALJ to consider Plaintiff's functional movement disorder under the mental disorder Listings and referring the ALJ to Dr. Austin's opinions and the neuropsychological evaluation as evidence:

> I believe that the medical evidence, the preponderance of the evidence demonstrates that Ms. Bahamon satisfies the criteria for listing 12.08, either meets or equals based on her functional movement disorder. The best evidence of that would be her statements from her doctors, Dr. Sabrina Austin, PhD. . . . . Also there is a very detailed neuropsychological evaluation beginning at 13F, page 2, dated July 3rd, 2018. Ms. Bahamon has, as I stated, function movement disorder. You'll see in the record conversion disorder with motor symptoms or deficit, pain disorder with psychological factors, major depressive disorder, recurrent, single, moderate, cervical dystonia and sun resistance, mild obstructive sleep apnea, obesity and it says -- there is a notation of myasthenia gravis, left arm weakness and right arm also. . . . then, of course, during this psychological -- the neuropsychological testing, we can see that there is objective evidence of how this affects her -- both of her upper extremities, so she has deficit -- moderate deficits on the left with fine motor function and mild on the right with, with fine motor function as well.

[TR 37- 38]. The attorney representative later corrected her reference to Listing 12.07, though she concludes by urging "she has a combination of impairments, so there's listing 12.04, 12.06 or [12.07]" [TR 52, 67].

### c. *VE Testimony*

The VE testified about Plaintiff's past employment history, classifying her last two occupations as medium work and light work [TR 60-61]. More specifically, the VE classified Plaintiff's past work as a physical therapist assistant, medium occupation, DOT 076.224-010, SVP 6, and the work as a rehabilitation manager, light occupation, DOT 076.117-010, SVP 8 [TR 61]. The ALJ then posed two hypothetical limitations to the VE, asking which past work a person could perform with the various limitations proposed [TR 61-65]. Plaintiff's attorney representative also questioned the VE with hypothetical limitations [TR 65-67]. The VE testified that an individual with the limitations in the ALJ's first hypothetical would not be able to perform Plaintiff's past work, as follows:

> Q      All right. For hypothetical #1, please assume an individual of the claimant's age, education and work experience. The individual can perform light work as that term is defined by regulations. However, the individual can only occasionally push, pull, reach and handle and finger objects with the non-dominant left upper extremity. She can frequently push, pull, reach and handle and finger objects with the dominant right upper extremity --
>
> A      That's push, pull, finger.
>
> Q      Reach and handle/finger.
>
> A      Finger, reach, handle, okay.
>
> Q      She can occasionally – strike that, she can never climb ladders, ropes and scaffolds. She can occasionally crawl. She should not be exposed to hazards, such as moving machinery or unprotected heights. She can understand, remember and carry out detailed but not complex tasks and instructions. She should not work in a fast-paced assembly line type environment. She can handle changes in a routine work environment. Could this individual perform any of the claimant's past work?
>
> A      No, sir.

[TR 61-62]. The VE identified other jobs at the light exertion level that an individual could perform with the limitations in the first hypothetical, including a cafeteria attendant, a salon

worker, and a survey worker [TR 63]. For the second hypothetical, the ALJ added the limitations

that "the individual cannot be exposed to crowds, defined as groups of more than five people for

more than an incidental basis," meaning "she can't be exposed to crowds for more than 10% of

the workday" [TR 63]. The VE testified that this limitation would preclude the survey worker

primarily, but also the cafeteria attendant and salon attendant to various degrees because of the

public nature of the jobs [TR 63]. The ALJ asked the VE to identify other jobs at the light

exertional level consistent with the limitations in the second hypothetical, and the VE identified

office helper, DOT 239.567-010, and order clerk, DOT 209.567-014, as two possible jobs at

sedentary occupation level [TR 63-64]. The ALJ also asked the VE what absenteeism tolerance

these jobs had, and the VE responded that more than monthly would preclude employment, noting

however that the DOT does not include absenteeism in its criteria [TR 64]. The VE confirmed no

conflict existed between her testimony and the DOT.

## III.    FINDINGS OF THE ALJ

### 1.    *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner

has promulgated regulations that establish a five-step process to determine whether a claimant

suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial

gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b).

Second, the claimant is not disabled if his alleged impairment is not severe, without consideration

of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c).

Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment

corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R.

§ 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed

impairment is not considered to be disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2.    *ALJ's Disability Determination*

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation [TR 13-25]. At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since July 21, 2017, the alleged onset date [TR 13]. At step two, the ALJ found Plaintiff has the following severe impairments: cervical spine disorder, rotator cuff tendinosis, idiopathic orofacial dystonia, functional movement disorder, conversion disorder with motor symptom or deficit, and a pain disorder with psychological factors [TR 14-18]. The ALJ found Plaintiff's allegations of myasthenia gravis and a neurocognitive disorder was insufficient to establish medically determinable impairments [TR 16]; and, that Plaintiff's anxiety disorder and major depressive disorder were nonsevere [TR 17]. At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) [TR 18-19]. At step four, the ALJ determined Plaintiff has the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally push, pull, handle, and finger objects with the non-dominant left upper extremity. She can occasionally reach overhead with the left upper extremity. She can never climb ladders, ropes, and scaffolds and can occasionally crawl. She can understand, remember, and carry out detailed but not complex tasks and instructions. She should not work in a fast-paced assembly-line type environment.

[TR 19]. Continuing the step four analysis, the ALJ determined that Plaintiff is unable to perform any past relevant work [TR 23-24]. At step five, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found that there are unskilled, light jobs existing in significant numbers in the national economy that Plaintiff could perform, such as such as a cafeteria attendant (DOT code 311.677-010), a salon attendant (DOT code 359.567-014), and a survey worker (DOT code 205.367-054) [TR 24-25]. Based on this determination, the ALJ concluded Plaintiff has not been under a disability from July 21, 2017, through the date of the ALJ's decision [TR 25].

### STANDARD OF REVIEW

In an appeal under § 405(g), a court "reviews a Commissioner's denial of social security disability benefits 'only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (quoting *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021)) (cleaned up); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert denied*, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). Substantial evidence "need not be a preponderance." *Webster*, 19 F.4th at 718 (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). Conflicts in the evidence are resolved by the ALJ; the Court cannot

reweigh the evidence or substitute its judgment for that of the Commissioner, though it will scrutinize the record to determine if evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995); *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a)(4).

## ANALYSIS

Plaintiff argues the ALJ erred (1) at steps two and three by applying an incorrect severity standard and conducting no evaluation of Listing 12.07; as well as (2) at step four by improperly substituting his own lay opinion for that of Plaintiff's treating physicians, namely by rejecting Dr. Sundaram and Dr. Austin's medical opinions [Dkt. 14].

### *Failure to Cite the* **Stone** *Severity Standard Is Not Error Where the ALJ References Social Security Ruling 85-28 Instead*

Plaintiff argues the case must be remanded because the ALJ failed to apply the correct severity standard as set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) [Dkt. 14 at 10-11]. Plaintiff further urges the ALJ erred in determining that Plaintiff's alleged impairments of anxiety disorder and major depressive disorder were not severe at step two.[2]

---

[2] Plaintiff only appeals the ALJ's assessment of her severe mental impairments, not any of the physical severe impairments found [Dkt. 14 at 1-22].

At step two, the ALJ must consider the severity of an impairment or combination of impairments to determine if the claimant is disabled. An impairment is not severe "if you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii). The Fifth Circuit interpreted the severity standard in *Stone*, holding "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340 (5th Cir. 1984)) (cleaned up). "ALJs are bound not just to use this standard but also to cite it (or to an equivalent authority) in their written decisions." *Keel*, 986 F.3d at 555. Nevertheless, a case "will not be remanded simply because the ALJ did not use 'magic words.'" *Id.* at 556 (quoting *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986)). Remand is only appropriate "where there is no indication the ALJ applied the correct standard." *Id.*

Here, Plaintiff is correct the ALJ did not cite the *Stone* standard, either by reference to the case or by otherwise quoting the standard [TR 14]. The ALJ opinion states the following, in pertinent part:

> At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "sever (20 CFR 404.1520(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it more than minimally limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individuals' ability to work (20 CFR 404.1522; Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.
> ***

> A medically determinable impairment is "severe" if it more than minimally limits your physical or mental ability to do basic work activities (20 CFR 404.1520(c), 404.1521; SSR 85-28). When determining whether a medically determinable impairment is "severe", the claimant's allegations of pain and other symptoms will be considered. See 20 CFR 404.1529(d); and SSR 85-28, 16-3p.

[TR 12, 14].  Although this language is facially less stringent than *Stone*, the Fifth Circuit and Texas district courts have subsequent to those decisions named by Plaintiff's brief found that citing SSR 85-28 is sufficiently close to the *Stone* standard to constitute an equivalent authority. *See Keel*, 986 F.3d at 556 (citing *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018)) ("Although we reaffirmed the traditional *Stone* standard in *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018), and *Garcia*, 880 F.3d at 705, we did not rule on whether SSR 85-28 comports with it. We now hold that it does.").  Indeed, in *Keel*, the Fifth Circuit expressly held that citation to SSR 85-28 is sufficient to comply with its mandate in *Stone*, explaining:

> *Stone* treats an impairment as not severe when it is of "such minimal effect" that it would not be expected to interfere with "the individual's ability to work." 752 F.2d at 1101. SSR 85-28 uses similar language focusing on "a minimal effect on an individual's ability to work." 1985 WL 56856, at *3. Though the precise wording differs, *Stone* and SSR 85-28 are not substantially different enough to warrant a finding of error.

986 F.3d at 556; *see also Riles v. Kijakazi*, No. CV H-20-1830, 2022 WL 584891, at *3 (S.D. Tex. Feb. 7, 2022) (citing *Keel*, 986 F.3d at 556) ("The Fifth Circuit recently confirmed that the SSR 85-28 articulation comports with the *Stone* standard."), *report and recommendation adopted*, No. CV H-20-1830, 2022 WL 584503 (S.D. Tex. Feb. 25, 2022); *Knapp v. Saul*, No. 7:19-CV-00069-O-BP, 2020 WL 3516130, at *4 (N.D. Tex. June 12, 2020) ("[T]he undersigned concludes that the ALJ properly incorporated the *Stone* standard when he cited SSR 85-28."), *report and recommendation adopted*, No. 7:19-CV-00069-O-BP, 2020 WL 3510732 (N.D. Tex. June 29, 2020).

Any in any event, here, any *Stone* error at step two is harmless. *Reynolds v. Astrue*, No. 4:11-CV-212, 2013 WL 2949991, at *4 (E.D. Tex. June 13, 2013) (citing *Taylor*, 706 F.3d at 603). It is undisputed that the ALJ proceeded past step two of the sequential evaluation process. And as the Commissioner urges [Dkt. 18 at 12-13], the Fifth Circuit holds that failure to make a severity finding at step two generally is not reversible error when an ALJ continues with the sequential evaluation process.[3] *Dise v. Colvin*, 630 F. App'x 322, 324 (5th Cir. 2015) ("[B]ecause the ALJ proceeded to step five of the analysis, any failure to find additional impairment severe at step two does not justify remand."); *Taylor*, 706 F.3d at 603 (concluding a *Stone* error does not require automatic remand where ALJ proceeds past step two).[4] Courts routinely apply a harmless error analysis "if the ALJ shows that the impairments deemed non-severe were still considered along with any severe impairments in determining whether the claimant meets a listing and, if not, in determining the claimant's residual functional capacity." *Owen v. Comm'r*, No. 2:19-CV-073-RSP, 2020 WL 1663533, at *2 (E.D. Tex. Apr. 3, 2020). There is "no legal error where an ALJ does not include mental limitations in a claimant's RFC so long as the ALJ considered the limiting effects and restrictions of all impairments in the RFC analysis, even those impairments that are non-severe." *Gary P. v. Saul*, No. 1:20-CV-00068-H-BU, 2021 WL 3518534, at *5 (N.D. Tex. July 19, 2021), *report and recommendation adopted*, No. 1:20-CV-068-H-BU, 2021 WL 3516238 (N.D. Tex. Aug. 10, 2021). Here, the ALJ did precisely that:

---

[3] The rationale for this principle is that the severity finding at step two is a threshold assessment that allows the ALJ to dismiss a claim without further evaluation. *Factory v. Comm'r*, No. 4:15-CV-00731-CAN, 2017 WL 1177992, at *5 (E.D. Tex. Mar. 29, 2017) (citing *Delgado v. Colvin*, No. 5:13-cv-137, 2014 WL 3361752, at *3-4 (N.D. Tex. July 9, 2014)). Thus, when an ALJ proceeds past step two, the case does not turn on the question of severity, but instead, whether the claimant's impairments prevent him or her from performing work. *Id.*

[4] "Procedural perfection is not required unless it affects the substantial rights of a party," and as such, the analysis must go an additional step to determine if there was substantial evidence to support an ALJ's finding that a particular impairment is not severe. *Taylor*, 706 F.3d at 603.

[A]lthough I have not found a severe mental impairment, I have included a limitation to detailed but not complex tasks and a prohibition against fast-paced assembly work to give claimant the benefit of the doubt that her otherwise "mild" B criteria limitations may, in this case, manifest in functional limitations.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

[TR 18].

### *The ALJ Addressed Plaintiff's Mental Impairments and Considered Listing 12.07*

Plaintiff also argues the ALJ failed to consider whether she meets Listing 12.07, notwithstanding that "the record contains objective medical findings that demonstrate an impairment that meets the criteria of Appendix 1 Listing 12.07" [Dkt. 14 at 12-18].   The Commissioner rejoins that the ALJ did consider Listing 12.07 by way of considering the paragraph B criteria applicable to each of the mental disorder 12.00 Listings [Dkt. 18 at 14-15].

Federal regulations require the ALJ to follow mandatory steps when evaluating the severity of mental impairments in claimants, which is known as the "special technique."  *See* 20 C.F.R. § 404.1520a.  In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment.  *See id.* § 404.1520a(b)(1).  To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each medically determinable impairment.  *Id.* § 404.1520a(b)(1); *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir. 2001).  Second, the ALJ must consider the functional limitations resulting from any medically determinable mental impairment in four broad functional areas: (a) understand, remember, or apply information; (b) interact with others; (c) concentrate, persist, or maintain pace; and (d) adapt

or manage oneself.  20 C.F.R. § 404.1520a(c)(3).  These areas of functional limitation are the

paragraph B criteria for Listing 12.00 mental disorders, including Listing 12.07.  *See* 20 C.F.R. Pt.

404, Subpt. P, App. 1 § 12.00(A)(2).  Next, the ALJ rates the degree of functional limitation for

each area using a five-point scale: none, mild, moderate, marked, and extreme.  *Id.*

§ 404.1520a(c)(4).  After the degree of limitation, the ALJ determines the severity of any such

impairment.  *Id.* § 404.1520a(d).  If the degree of limitation is mild or none for a functional area,

the impairment is not severe.  *Id.* § 404.1520a(d)(1).  The ALJ's written decision must incorporate

pertinent findings and conclusions based on the technique and must include a specific finding of

the degree of limitation in each of the functional areas described.  *Id.* § 404.1520a(e)(4).

At step three, the ALJ considers if the severe impairments meet or equal disorders covered

by the Listings.  20 C.F.R. § 404.1520a(d)(2).  The ALJ must compare the medical findings about

the claimant's impairment and degree of functional limitation to the Listing criteria to determine

if the impairment meets or is equivalent in severity to the listed mental disorder.  20 C.F.R.

§ 404.1520a(d)(2).  If a severe impairment does not meet or equal a listed mental impairment, the

ALJ moves to the RFC assessment at step four.  20 C.F.R. § 404.1520a(d)(3).

Plaintiff argues the ALJ erred at step two because

the ALJ did not consider whether [Plaintiff's] mental impairments met or equaled
the criteria of any Appendix 1 Listing. [] The record, however, contains objective
medical findings that support a finding that [Plaintiff's] mental impairment meets
the criteria of Appendix 1 Listing 12.07. Therefore, the ALJ's step two error was
not harmless.

[Dkt. 14 at 12].  At step two, the ALJ determines *whether* mental impairments are severe; at step

three, the ALJ considers whether a severe mental impairment meets or equals all of the criteria of

a Listing.  *See* 20 C.F.R. § 404.1520a(d)(2).  While the step two analysis borrows the paragraph B

criteria, only at step three does the ALJ analyze all of the Listing criteria.  *See* 20 C.F.R.

§ 404.1520a(d)(2) ("*If your mental impairment(s) is severe*, we will *then* determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.") (emphasis added).

Notably, at step two, the ALJ found the specific mental impairments of myasthenia gravis and neurocognitive disorder were not medically determinable impairments in the first place:

> Furthermore, in the absence of any diagnosis, documented diagnostic findings, or documented clinical abnormalities, I find the claimant's mere allegation of myasthenia gravis and a neurocognitive disorder, is insufficient to establish medically determinable impairments or other medically determinable physical conditions (20 CFR 404.1529; and SSRs 82-52 and 16-3p). Specifically, Bharathy Sundaram, M.D. noted on October 10, 2018, that the claimant myasthenia antibodies were negative, she exhibited no abnormal findings, and myasthenia gravis had been ruled out (Exhibit 1 lF/29). Furthermore, the claimant's formal neuropsychological testing found overall generally intact neurocognitive functions with a severe deficit observed in fine motor dexterity (left), mild decrements in fine motor dexterity (right), and immediate visual design recall. Although not in the impaired range, the claimant did exhibit decline from average overall ability in semantic verbal fluency, visuomotor problem solving, graphesthesia (left), simple auditory attention, processing speed, delayed visual design recall, visual cognitive flexibility, and resistance to cognitive interference (fluency). However, her cognitive decline was not significant to warrant a diagnosis of a progressive neurodegenerative disease process (Exhibit BF/13-14). No treating, examining, or reviewing medical source has diagnosed the claimant with myasthenia gravis or a neurocognitive disorder. Therefore, the claimant's allegation of myasthenia gravis and a neurocognitive disorder is insufficient to establish a medically determinable impairment or other medically determinable physical condition.

[TR 16-17]. The ALJ found Plaintiff's depression and anxiety to be medically determinable, and applied the paragraph B criteria to determine whether Plaintiff had functional limitations in the four areas and the *degree* of any such limitations:

> The claimant's medically determinable mental impairments of anxiety disorder and major depressive disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. In making this finding, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404,

Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation. The record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and respond to questions from medical providers. Further, results from the claimant's formal neuropsychological testing revealed superior functioning in her overall verbal memory, immediate verbal recall, delayed verbal recall, short-delay verbal recall, and long-delay verbal recall (Exhibit 13F/13).

The next functional area is interacting with others. In this area, the claimant has a mild limitation. Specifically, the claimant was cooperative with treating providers throughout the record, and she reported no issues getting along with authority figures (Exhibit 5E/7). The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. Formal neuropsychological testing revealed low average functioning in visuomotor problem solving, simple auditory attention, processing speed, visual cognitive flexibility, and resistance to cognitive interference (fluency) (Exhibit 13F/13). Additionally, the claimant reported she could finish what she started, she experienced no problems following instructions, and no problems handling stress and changes in a routine (Exhibit 5E/6-7).

Finally, the fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. Specifically, the claimant reported she was capable of driving and took care of her husband after he injured himself (1lF/34; 16F/3; Hearing Testimony). Further, the claimant reported no difficulty bathing, shaving, or feeding herself. She did not need special reminders to take care of her personal needs or grooming, and did not need reminders taking medicine. She could complete daily meals and sandwiches, she could perform household cleaning such as laundry, sweeping, and the dishes, and she could drive, go out alone, and grocery shop (Exhibit 5E/2-4).

*Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere* (20 CFR 404.1520a(d)(l)). I have considered the evidence discussed throughout the decision in my B criteria.

[TR 17-18]. At step three, the ALJ specifically discussed those reasons Plaintiff did not meeting

Listing 1.04 and more globally found "[a]fter a review of the entire record, I am in agreement with

the prior determinations of the non-examining consultants of the State agency that no listing is met

or equaled" [TR 19].

Plaintiff argues this is not sufficient and that the ALJ failed to consider Listing 12.07, which

covers somatic symptom and related disorders, including conversion disorder [Dkt. 14 at 12-18].

To meet Listing 12.07, Plaintiff must meet or exceed the following A and B criteria:

12.07 Somatic symptom and related disorders (see 12.00B6), satisfied by A and B:

A. Medical documentation of one or more of the following:
    1. Symptoms of altered voluntary motor or sensory function that are not
    better explained by another medical or mental disorder;
    2. One or more somatic symptoms that are distressing, with excessive
    thoughts, feelings, or behaviors related to the symptoms; or
    3. Preoccupation with having or acquiring a serious illness without
    significant symptoms present.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of
mental functioning (see 12.00F):
    1. Understand, remember, or apply information (see 12.00E1).
    2. Interact with others (see 12.00E2).
    3. Concentrate, persist, or maintain pace (see 12.00E3).
    4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.07. Plaintiff advances the medical reports of record

demonstrate at least one of the A criteria for Listing 12.07.

As an initial matter, Listing 12.07 requires a mental disorder to satisfy *both* paragraph A

and B requirements.[5] This Listing cannot be satisfied by A criteria alone. *See Hendry v. Comm'r*,

No. 3:16-CV-08851 (PAZ), 2018 WL 4616111, at *11 (D.N.J. Sept. 26, 2018) ("Listing 12.07 is

---

[5] Listing 12.07 requires a disorder to satisfy the requirements of both paragraphs A *and* B. Because the ALJ found
the B criteria were not met, this Listing cannot be satisfied by A criteria alone. Even if the ALJ did not explicitly
reference Listing 12.07, there can be no prejudicial error for this reason. *See Hendry*, 2018 WL 4616111, at *11 ("the
Court finds that the omission was harmless because the ALJ's Step Three discussion permitted meaningful judicial
review of the evidence as related to Listing 12.07.") (citing *Scuderi v. Comm'r*, 302 F. App'x 88, 90 (3d Cir. 2008)
(ALJ need not specifically mention any Listing to make judicially reviewable finding)).

met when the requirements of both paragraphs A and B are met"). To this point, the Commissioner urges that although the ALJ did not expressly discuss or identify Listing 12.07, the ALJ in effect determined that Listing 12.07 was not met because the ALJ determined the paragraph B criteria were not met, which are applicable to most mental disorder Listings, including Listing 12.07 [Dkt. 18 at 14-15].

As outlined *supra*, albeit at step two rather than at step three, the ALJ considered the four broad areas of mental functioning set out in the paragraph B criteria for Listing 12.00, including Plaintiff's ability to: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself [TR 17-18]. When assessing the first functional area, the ALJ found a mild limitation. In the second functional area, the ALJ found a mild limitation; specifically, the claimant was cooperative with treating providers throughout the record and reported no issues getting along with authority figures [TR 17]. Third, the ALJ found a mild limitation in the functional area of concentrating, persisting, or maintaining pace. Lastly, the ALJ found that Plaintiff has no limitation in adapting or managing oneself. She can drive her husband, took care of her husband after an accident, reported no difficulty bathing, shaving, or feeding herself, did not need special reminders to groom herself, and did not need reminders to take medicine. She makes daily meals and sandwiches, drive, go out alone, and grocery shop [TR 18]. To reiterate, the ALJ concluded that Plaintiff had either mild or no limitations in these functional areas.

Because the Court can look to the ALJ's step two findings in order to determine whether the ALJ's decision is adequate at step three, the ALJ provided an adequate explanation regarding why Plaintiff does not satisfy the paragraph B criteria for the disorders of Listing 12.00 [TR 17-

18], which necessarily includes Listing 12.07.[6]  *See Labit v. Comm'r*, No. 1:16-CV-488-SKL, 2018 WL 563837, at *4 (E.D. Tenn. Jan. 25, 2018) ("The fact that the ALJ made this finding at step two rather than at step three does not constitute harmful error. . . . The ALJ provided an adequate explanation of his Paragraph B findings in his analysis at step two of the sequential process. Because the Court can look to the ALJ's step two findings in order to determine whether the ALJ's decision is adequate at step three, Plaintiff's argument on this issue is without merit"); *Sanchez v. Berryhill*, No. 3:17-CV-00148-RFC, 2017 WL 4873716, at *3 (W.D. Tex. Oct. 27, 2017) ("The Court finds that there is substantial evidence in the record to support the ALJ's determination that Plaintiff had only mild and moderate limitations and therefore did not satisfy the requisite criteria of Listing 12.07. As such, Plaintiff is not entitled to relief on this claim."); *see also Waldrip v. Colvin*, No. 3:16CV64-MTP, 2017 WL 5056421, at *6 (S.D. Miss. Aug. 25, 2017) (collecting cases) ("even if it were error to not specifically discuss Listing 12.07 or somatoform disorders, it was harmless error, as the ALJ discussed the 'Paragraph B' factors when discussing Plaintiff's other alleged mental disorders."); *Maghan v. Comm'r*, No. CV-19-01768-PHX-MTM, 2020 WL 2768696, at *4 (D. Ariz. May 28, 2020) ("the ALJ found only mild or no limitations in his evaluation of the other three factors (AR 196-97), and Plaintiff presents no showing that those determinations by the ALJ would change even if Listing 12.07 had been explicitly considered").[7]

---

[6] As explained in Listing 12.00, "When we refer to 'paragraph B criteria' or 'area[s] of mental functioning' in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(A)(2)(b). Listing 12.00F defines he general areas of functioning considered as the paragraph B criteria, and Listing 12.07's paragraph B criteria cites the general B criteria defined in Listing 12.00F. *See id.* § 12.07.

[7] An ALJ's failure to recite a specific Listing constitutes harmless error where the plaintiff does not prove she actually met any such Listing and where the ALJ's reasons were not bare conclusions that prevent meaningful review. *Rudd v. Colvin*, No. 4:14-CV-104, 2015 WL 5719615, at *2 (E.D. Tex. Sept. 28, 2015). Here, again, the ALJ found that Plaintiff's mental impairments, though mild, warranted consideration when determining the limitations in the RFC:

> Finally, I specifically note that no State agency psychological consultant concluded that a mental listing is medically met or equaled (Exhibit 1 A; 3 A). However, although I have not found a severe mental impairment, I have included a limitation to detailed but not complex tasks and a prohibition against fast-paced assembly work to give claimant the benefit of the doubt that her otherwise "mild"

***The ALJ Did Not Substitute His Lay Opinion for Medical Evidence***

The Social Security Administration's new rule for assessing medical opinion evidence governs all claims filed on or after March 27, 2017, including Plaintiff's here. *See* 20 C.F.R. § 404.1520(c). The old rule required the ALJ to give a treating physician's opinion "controlling weight" in the absence of specific mitigating factors, and to "always give good reasons" in the determination for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). The new rule eliminates the "controlling weight" given to treating physicians. 20 C.F.R. § 404.1520c(a). A medical opinion is a statement about what functional limits a claimant may have from an impairment. 20 C.F.R. § 404.1513(a)(2).

The new rule, 20 C.F.R. § 404.1520(c), provides that the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, the ALJ shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations:

---

B criteria limitations may, in this case, manifest in functional limitations. The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

[TR 18]. Therefore, any step three error was harmless because the ALJ considered the nonsevere impairments when determining Plaintiff's RFC. *See Sheridan v. Comm'r*, No. 1:18-CV-300-MAC-KFG, 2019 WL 6003297, at *5 (E.D. Tex. Aug. 30, 2019) ("the ALJ completed all five steps of the disability determination and considered Sheridan's non-severe impairments in the process."), *report and recommendation adopted*, No. 1:18-CV-300, 2019 WL 6002194 (E.D. Tex. Sept. 18, 2019); *Danny R. C. v. Berryhill*, No. 3:17-CV-1682-BH, 2018 WL 4409795, at *15 (N.D. Tex. Sept. 17, 2018) ("although the ALJ found that Plaintiff's depression was not a severe impairment, his decision reflects that he considered Plaintiff's mental functioning when performing his RFC analysis."); *Gonzales v. Colvin*, No. 3:15-CV-0685-D, 2016 WL 107843, at *5 (N.D. Tex. Jan. 11, 2016) ("The ALJ's decision demonstrates that he took into account Gonzales' mental impairments when performing his RFC analysis. Before formulating the RFC, the ALJ noted that Gonzales complained of depression, bipolar, and anxiety at the administration hearing. The ALJ analyzed the paragraphs B and C criteria, determined that Gonzales has no severe mental impairment, and listed 'bipolar disorder (fulling controlled by medication)' as a non-severe impairment that causes 'no functional limitations to basic work activities.'").

(1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  *See* 20 C.F.R. §§ 404.1520(b)(2), 404.1520c(a).  Supportability means the degree to which objective medical evidence supports the medical opinion at issue, and consistency looks to the consistency between different medical opinions across the record.  20 C.F.R. § 404.1520c(c)(1)-(2).  The new articulation requirements do not require the ALJ to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. 20 C.F.R. § 404.1520c(b)(1)-(2); *see Moore v. Comm'r*, No. 3:20-CV-241-SA-DAS, 2021 WL 2834395, at *2 (N.D. Miss. July 7, 2021) (finding that the medical source regulations do not "require the ALJ to expressly address the persuasiveness of every opinion within every report").

Plaintiff argues that the ALJ improperly rejected the opinions expressed by treating neurologist Dr. Sundaram and treating clinical psychologist Dr. Austin, instead relying upon his own lay interpretation of medical evidence to support his RFC finding [Dkt. 14 at 16-22]. Specifically, Plaintiff argues there was not sufficient evidence for the ALJ to clearly establish the effect of Plaintiff's mental impairments after rejecting Drs. Sundaram and Austin.  The Commissioner argues in response that the ALJ applied the correct legal standard for assessing claims filed after March 27, 2017 by considering "the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520(c)" [Dkt. 11-2 at 9].

The ALJ expressly found the opinion of treating neurologist Dr. Sundaram "unpersuasive" and "inconsistent." The ALJ noted Dr. Sundaram in his records consistently described Plaintiff as alert and oriented with normal speech and cortical functions, including intact language and comprehension and "general knowledge and judgment with normal variation" until December 2018 [TR 16, 22-23, 464-74]. To that end, the ALJ made the following conclusion:

> Finally, I find the find the opinion provided by Dr. [Sundaram] unpersuasive (Exhibit 19F). Specifically, Dr. Sundaram detailed the claimant's functional capacity without providing a sufficient nexus to a medically determinable impairment reasonably capable of producing the symptoms and limitations. The opinion is inconsistent with the rather minimal objective findings described at that time and on updated medical treatment visits. For example, Dr. [Sundaram's] clinical [examinations] were routinely normal except for giveaway weakness with the left upper extremity (Exhibit 11F/28, 31, 35, 38, 41). Dr. [Sundaram] opined the claimant would have substantial loss in the ability to maintain attention and focus, complete a normal work day from interruption from psychologically based symptoms, get along with co-workers, supervisors, and the general public, and no useful ability to function in usual work stresses or settings (Exhibit 19F/2-3). However, this is inconsistent with his almost normal findings of the claimant's orientation, comprehension, and general knowledge (Exhibit 11F/28, 31, 35, 38, 41). Furthermore, the claimant was cooperative with treating providers throughout the record, and she reported no issues getting along with authority figures (Exhibit 5E/7)

[TR 23]. The ALJ found the opinions by Dr. Austin only "somewhat persuasive" because the opinions did not issue limitations in vocational terms, and therefore the extent of said limitations were unclear [TR 22] (citing Exhibit 14F; 18F). The ALJ acknowledged Dr. Austin found the questionnaire mostly unanswerable because the questions addressed capacity, which she was not qualified to opine on. She stated, "I don't do capacity evaluations," noting "[c]ognitive capacity is the domain of neuropsychologists," and she was not such a specialist [TR 22, 743]. Despite this, and contrary to Plaintiff's contention, the ALJ did not outright reject Dr. Austin's opinion but acknowledged the limits of her medical opinion:

> However, I acknowledge the recommendation that she not work full-time and I have accepted the diagnoses of a pain disorder with related psychological factors and a conversion disorder with motor symptom or deficit. Therefore, I incorporated restrictions to the left upper extremity and included a limitation to detailed but not complex tasks and a prohibition against fast-paced assembly work in the residual functional capacity. I acknowledge the inherent difficulty in attempting to parse the limitations created by a conversion disorder such as that identified by Dr. Austin. However, in particular, I note that the claimant's performance on the neuropsychological evaluation suggests that her subjective allegations have been overstated to some extent, whatever the underlying etiology.

[TR 22]. The ALJ also considered "the neuropsychological evaluation performed by Apryl Harris, Psy.D." in July 2018 which found Plaintiff's "overall cognitive functions [were] not significantly impaired" and that Plaintiff had "generally intact overall neurocognitive functions" [TR 17,501]. Harris' testing is supportive of the ALJ's Paragraph B findings and the RFC assessment [TR 22]. Results from Plaintiff's formal neuropsychological testing revealed superior functioning in her overall verbal memory, immediate verbal recall, delayed verbal recall, short-delay verbal recall, and long-delay verbal recall [TR 17, 501]. Throughout the record, Plaintiff was cooperative with treating providers and reported no issues getting along with authority figures or handling changes in routine and stress [TR 17, 218]. Plaintiff reported she could finish what she started and that she experienced no problems following instructions [TR 217-218]. Plaintiff reported she was capable of driving and took care of her husband after he injured himself and that she had no difficulty bathing, shaving, or feeding herself [TR 213-214]. She did not need special reminders to take care of her personal needs or grooming, including taking medication [TR 14]. In addition, the ALJ considered Plaintiff's ability to provide information about her health, to describe her prior work history, to follow instructions from healthcare providers, to comply with treatment outside of a doctor's office or hospital, and to respond to questions from medical providers [TR 17]. The ALJ did not substitute his lay opinion for medical opinions of Dr. Sundaram or Dr. Austin, instead weighing their opinions for consistency and supportability, which the Court finds is supported by

substantial evidence in the record.  In sum, the Court finds the ALJ's decisions regarding the opinions of Drs. Sundaram and Austin is supported by the substantial evidence and is the product of the application of proper legal standards.  *See Labit*, 2018 WL 563837, at *11 ("the Court concludes that the ALJ did not err in his consideration of Dr. Ball's opinion, or in his decision that Plaintiff did not meet the requirements of Paragraph B of Listing 12.07. The ALJ's discussion of his Paragraph B findings was also adequate, even though it was included in step two rather than step three of the sequential process. Finally, the ALJ's characterization of Plaintiff's activities of daily living is reasonable in light of the evidence in the record, and even in light of the specific evidence Plaintiff cites which could tend to support Plaintiff's position. The Court concludes that the ALJ's overall assessment of Plaintiff's RFC is supported by substantial evidence, and that the Commissioner met her burden of proof at step five by relying on the testimony of the VE."); *Gonzales*, 2016 WL 107843, at *6 (finding no step four error "when the ALJ analyzed Gonzales' RFC, he discussed the Parkland and Metrocare mental health records, psychological examinations conducted by Drs. Hall and Thompson, and Gonzales' testimony and reports regarding his mental impairments. . . . Accordingly, the court concludes that the ALJ sufficiently considered Gonzales' mental impairments in calculating the RFC").

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends the Commissioner's decision be **AFFIRMED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 1st day of July, 2022.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE